IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOEY MARLIN TATE                                                                          PLAINTIFF

    v.                              Civil No. 2:20-cv-02096-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                                            DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Joey Marlin Tate ("Tate"), brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.     Procedural Background

Plaintiff filed his application for benefits on May 3, 2016, alleging an onset date of April 1, 2004, due to post traumatic stress disorder ("PTSD"), social phobia, anxiety, paranoia, depression, obsessive compulsive disorder ("OCD"), seizures, diabetes, and a knee injury. (ECF No. 15-2, p. 11; 15-4, pp. 9-10). Plaintiff was 34 years old on his alleged disability onset date, had at least a high school education, and was unable to perform past relevant work. (ECF No. 15-2, p.

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

23). The Commissioner denied his application initially and on reconsideration. (ECF No. 15-2, p. 11; ECF No. 15-4, pp. 8, 29). At the Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on March 7, 2018, during which the Plaintiff was present but not represented by counsel. (ECF No. 15-3, pp. 38-55). At the Plaintiff's request, the ALJ granted a postponement of the hearing for the Plaintiff to get representation. (ECF No. 15-3, pp. 42-43; ECF No. 15-5, p. 49). The ALJ held the next administrative hearing on January 28, 2019. (ECF No. 15-3, pp. 3-36). Plaintiff was present but again not represented by counsel. (*Id.*).

On July 19, 2019, the ALJ concluded that the Plaintiff's insulin-dependent diabetes mellitus, osteoarthritis/degenerative joint disease and transverse fractures of the lumbar spine, osteoarthritis/degenerative disc disease of the left knee, history of open reduction and internal fixation ("ORIF") of a left leg fracture, history of seizures, major depressive disorder, generalized anxiety disorder, not otherwise specified ("NOS"), social anxiety, personality disorder NOS/other specified personality disorder with mixed features, and post-traumatic stress disorder (PTSD) were severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 15-2, pp. 13-15).

He then found the Plaintiff capable of performing light work, except that he can occasionally climb ramps and stairs; he can never climb ladders, ramps, and scaffolds; he can occasionally balance and stoop; he can never kneel, crouch, or crawl; and he must avoid even moderate exposure to hazards, including no driving as part of work. In addition, he is capable of performing unskilled work where interpersonal contact with coworkers and supervisors is incidental to the work performed and there is no contact with the public, where the complexity of tasks is learned and performed by rote with few variables and little use of judgment, and where the supervision required is simple, direct, and concrete. (ECF No. 15-2, pp. 15-23). With the

assistance of a vocational expert ("VE"), the ALJ found the Plaintiff could perform work as a bottling line attendant, net washer, fish-stringer assembler, assembler, motor polarizer, and masker. (ECF No. 15-2, pp. 23-24).

The Appeals Council denied the Plaintiff's request for review on April 2, 2020. (ECF No. 15-2, pp. 2-5). Plaintiff then filed this action. (ECF No. 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 18, 19), and the case is now ready for decision.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217

(8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. 20 C.F.R. § 416.920(a)(4). The fact finder only considers a Plaintiff's age, education, and work experience in the light of his residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 416.920(a)(4)(v).

### III.   Discussion

Plaintiff raises six issues in his *pro se* appeal: (1) whether the ALJ considered all of the Plaintiff's impairments; (2) whether the ALJ considered his impairments in combination; (3) whether substantial evidence supports the ALJ's symptom evaluation; (4) whether the ALJ properly developed the record; (5) whether substantial evidence supports the ALJ's RFC finding; and (6) whether substantial evidence supports the ALJ's Step Five finding. (ECF No. 18, pp. 4-6). After thoroughly reviewing the record, we find that substantial evidence does not support the ALJ's RFC finding. Because reversal and remand is warranted on these grounds, the Plaintiff's remaining arguments will not be addressed.

Residual functional capacity ("RFC") is the most a person can do despite that person's limitations. 20 C.F.R. 416.945. A disability claimant has the burden of establishing his or her RFC. *Vossen v. Astrue,* 612 F. 3d 1011, 1016 (8th Cir. 2010). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The ALJ is required to consider all the evidence relating to a claimant's subjective complaints, including: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of his or her pain; 3) precipitation and aggravating factors; 4) dosage, effectiveness, and side effects of his or her medication; and 5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians. *Polaski*, 739 F.2d at 1322.

An ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them. *Id*. However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853

(8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)). The Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Nevertheless, if a claimant fails to seek treatment to the degree the ALJ would expect given his complaints, an ALJ may not simply find the claimant's symptoms inconsistent with the evidence in the record without considering possible reasons the claimant did not seek treatment consistent with the degree of his complaints. An ALJ must consider and address the reasons an individual did not pursue treatment that are pertinent to the individual's case, such as inability to pay or impediment by a mental illness. The ALJ must explain how he considered the individual's reasons in the evaluation of symptoms. *See* Social Security Ruling 16-3p, 2016 WL 1119029 at *8 (Mar. 16, 2016).

Here, the ALJ found that the Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical records, which the ALJ assessed contained generally mild findings. (ECF No. 15-2, pp. 16-20). In so finding, he referenced the Plaintiff's medical care mostly for type I diabetes that was generally characterized as uncontrolled but without complications, treated with administration of insulin on a sliding scale several times daily and recommendations to follow a diabetic diet and to exercise, and associated with multiple episodes of hyperglycemia-induced seizures related to insulin use and resulting in trips to the hospital emergency department (ED). (*Id.* at 20). The ALJ pointed to the fact that the Plaintiff was never hospitalized after his blood sugar levels were stabilized in the ED. (*Id.*).

Regarding the Plaintiff's treatment for depression and anxiety, the ALJ referenced reports of circumstantial stress and social phobias, mental status exams showing the Plaintiff well-groomed with normal speech and no hallucinations, and variable symptoms that were helped but

not eliminated by treatment. (*Id.* at 21). The ALJ additionally referenced the Plaintiff's ability to complete his personal care, prepare his own meals, attend college classes, and have people visit him at his mother's house. (*Id.* at 19, 21). In his summary of the medical evidence, the ALJ made note of multiple instances in which the Plaintiff declined medications due to side effects affecting his mental impairments; declined or missed medical appointments; and, on one occasion, left the emergency department against medical advice. (*Id.* at 17-20). The ALJ then found, in relevant part, that Plaintiff was capable of performing unskilled work where interpersonal contact with coworkers and supervisors is incidental to the work performed and there is no contact with the public, where the complexity of tasks is learned and performed by rote with few variables and little use of judgment, and where the supervision required is simple, direct, and concrete. (ECF No. 15-2, pp. 15-23).

The ALJ's decision does not, however, indicate that he considered or addressed pertinent reasons why the Plaintiff might have not pursued treatment or explained how he considered the Plaintiff's reasons for not pursuing advised treatment when he evaluated the Plaintiff's symptoms. The record reveals that the Plaintiff reported severe social anxiety that hindered his ability to seek consistent mental health and diabetes treatment, problems accessing medication due to insurance constraints, variable side effects and efficacy of medications, and inability to complete an online college course resulting in academic probation and a leave of absence. The objective medical and opinion evidence also reveal diagnoses of schizoid personality disorder, physician opinions that the Plaintiff would be severely impaired in his ability to communicate and socialize when stressed and sustain persistence when completing tasks, and multiple emergency department visits to stabilize the Plaintiff's blood sugar. Thus, the record belies the conclusion that the Plaintiff was able to properly manage himself or his physical conditions despite his mental impairments.

As to the objective medical evidence, from May 2015 to April 2016, the Plaintiff received treatment for anxiety disorder not otherwise specified (NOS), polysubstance dependence, rule out antisocial personality disorder, and mood disorder with Arkansas Department of Corrections. (ECF No. 15-8, pp. 54-67). He was prescribed buspirone, citalopram, and insulin.[2]

In June 2016, the Plaintiff sought treatment with Dayspring Behavioral Health ("Dayspring") and was diagnosed with generalized anxiety disorder ("GAD"), PTSD, and major depressive disorder. (ECF No. 15-8, pp. 96-108). It was noted that the Plaintiff demonstrated considerable problems with social and emotional health as well as self-harmful behaviors. (*Id.*). By July, the Plaintiff was being medicated for GAD, PTSD, and schizoid personality disorder. (ECF No. 15-8, pp. 122-24). His prescriptions included clonazepam, Latuda, escitalopram, and topiramate.[3] He reported continued paranoid thoughts and daily bouts of moderate to severe anxiety that caused him not to leave the house. It was noted that he spoke in decreased volumes and delusions were present. (*Id.*). He also stated that he hoped to get his bachelor's degree, but he was having problems with Medicaid not paying for all the medications he needed for mental health treatment and diabetes. (ECF No. 15-8, pp. 125-26).

In August 2016, the Plaintiff continued treatment for GAD, PTSD, and schizoid personality disorder. (ECF No. 15-8, pp. 155-56). The psych exam revealed a blunted mood and affect and easy distractibility. (*Id.*). The Plaintiff reported noncompliance with medication due to cost restrictions and restriction of Medicaid medication slots. He requested less expensive medications.

---

[2] Citalopram is used to treat depression. *See* Citalopram, at https://medlineplus.gov/druginfo/meds/a699001.html (last accessed July 26, 2021). Buspirone is used to treat anxiety. *See* Buspirone, at https://medlineplus.gov/druginfo/meds/a688005.html (last accessed July 26, 2021).

[3] Clonazepam is used to treat seizures. *See* Clonazepam, at https://medlineplus.gov/druginfo/meds/a682279.html (last accessed July 26, 2021). Latuda is used to treat schizophrenia. *See* Lurasidone, at https://medlineplus.gov/druginfo/meds/a611016.html (last accessed July 26, 2021). Escitalopram is used to treat depression. *See* Escitalopram, at https://medlineplus.gov/druginfo/meds/a603005.html (last accessed July 26, 2021). Topiramate is used to treat seizures. *See* Topiramate, at https://medlineplus.gov/druginfo/meds/a697012.html (last accessed July 26, 2021).

(*Id.*).  Also, in August, the Plaintiff was treated on two occasions in the emergency department for hypoglycemia and a transverse process fracture due to a fall.  (ECF No. 15-8, pp. 171-91).

From July 2016 to August 2017, the Plaintiff continued mental health treatment with Dayspring.  (ECF No. 15-9, pp. 94-112).  His diagnoses were GAD, PTSD, and schizoid personality disorder.  His medications included trazodone, Xanax, and citalopram.[4]  In July, it was noted that the Plaintiff was very closed off during the session.  He reported high levels of anxiety especially around people and that he was only sleeping and staying inside the house.  He stated that his friends would come to visit him, but he asked them to stop visiting.  He reported difficulty focusing on anything, including watching TV.  By May 2017, he had been warned about failing to attend his therapy appointments, and, by August 2017, he reported being on academic probation.  He was discharged from Dayspring for reportedly signing for his mother's Xanax prescription.  (*Id.*).

From June 2016 to December 2018, the Plaintiff was treated by Family Practice Associates of Clarksville ("Family Practice"), including Dr. Kuykendall, who noted that the Plaintiff's diabetes was poorly controlled, described his A1C as terrible, and referred him to endocrinology.  (ECF No. 15-9, pp. 20-53; ECF No. 15-10, pp. 168-87).  While his mental health medication was managed by Dayspring, exams with Family Practice noted that the Plaintiff's anxiety was poor.  He often reported that his mental health medication was not working and, on one occasion, reported that he missed his counseling appointment.  (ECF No. 15-9, pp. 20-53).

In December 2017, the Plaintiff was treated in the emergency department for a hypoglycemic seizure.  (ECF No. 15-9, at 76-87).  He reported that he had been having

---

[4] Trazodone is used to treat depression.  *See* Trazodone, at https://medlineplus.gov/druginfo/meds/a681038.html (last accessed July 26, 2021).  Xanax is used to treat anxiety and panic disorders.  *See* Alprazolam, at https://medlineplus.gov/druginfo/meds/a684001.html (last accessed July 26, 2021).

hypoglycemia with altered mental status at least once a week for quite some time. He had not taken his Lantus the morning of this episode.[5] The treating physician suspected that most of these episodes were likely hypoglycemia-induced confusion and arranged to confer with Dr. Kuykendall to adjust the Plaintiff's medication. (*Id.*).

In September 2018, the Plaintiff requested a referral to a psychiatrist from Dr. Kuykendall. (ECF No. 15-10, pp. 168-87). He continued to demonstrate anxiety and continued to take zolpidem and sertraline, as well as his diabetic medications.[6] In December, the Plaintiff was seen by Dr. Kuykendall again for a prescription refill, and the Plaintiff reported problems getting coverage for medications from Medicaid. It was noted that the Plaintiff was intoxicated during the appointment, and Dr. Kuykendall referred the Plaintiff for counseling. (*Id.*).

In June 2019, the Plaintiff was treated in the emergency department for diabetic ketoacidosis and reported to the treating physician that he had not been taking his insulin for several days. (ECF No. 15-2, pp. 34-62). Dr. Shakir noted that the Plaintiff's failure to take his insulin might be related to his history of depression. His discharge diagnoses included major depression, acute kidney injury, ataxia, diabetic polyneuropathy, and frequent falls. (*Id.*).

In September 2019, the Plaintiff was admitted for suicidal ideations and gesture after giving himself 80 units of Novolog and two tablets of citalopram in a suicide attempt.[7] (ECF No. 15-2, pp. 68-79). The Plaintiff was placed on a 72-hour hold but eloped from the ED. Upon voluntary return to the ED, he reported that he was no longer suicidal. He was placed on 72-hour hold again, to which he agreed, and he was then transferred to Saline Memorial Hospital. (*Id.*). There, the

---

[5] Lantus is used to treat type I diabetes. *See* Insulin Glargine (rDNA origin) Injection, at https://medlineplus.gov/druginfo/meds/a600027.html (last accessed July 23, 2021).
[6] Zolpidem is used to treat insomnia. *See* Zolpidem, at https://medlineplus.gov/druginfo/meds/a693025.html (last accessed July 26, 2021). Sertraline is used to treat depression, OCD, panic attacks, PTSD, and social anxiety disorder. *See* Sertraline, at https://medlineplus.gov/druginfo/meds/a697048.html (last accessed July 26, 2021).
[7] Novolog is used to treat type I diabetes. *See* Insulin Aspart, at https://medlineplus.gov/druginfo/meds/a605013.html (last accessed July 26, 2021).

Plaintiff was treated for major depressive disorder with psychosis and agoraphobia. (ECF No. 15-2, pp. 63-67). Dr. Crane recommended continued medication compliance, including citalopram, zolpidem, Lantus, Humulin, propranolol, risperidone, and hydroxyzine pamoate.[8]

As to the Plaintiff's reported functionality, in May 2016, he completed disability and function reports, alleging PTSD, social phobia, anxiety, paranoia, depression, OCD, seizures, diabetes, and a knee injury. (ECF No. 15-7, pp. 6-20). He reported that he stays inside and away from people all day due to anxiety, fear, paranoia, and depression. His problems with hygiene were mostly mental – wearing the same clothes for days at a time, failing to bathe regularly, and needing reminders to take care of personal needs. He could only go out by riding in a car as he had no driver's license. He could attend a weekly evening church service if someone were to accompany him and if he could sit in the back. He reported inability to handle stress or change of routine or follow instructions due to his inability to be around people. He reportedly had to run away to be alone or stay in his comfort zone at home. (*Id.*).

The ALJ found that the Plaintiff was generally independent in all activities, including preparing meals. (ECF No. 15-2, pp. 15-23). However, the Plaintiff reported much difficulty feeding himself in a way that properly controlled his blood sugar. (ECF No. 15-7, pp. 6-20). The Plaintiff, his mother, his aunt, and his uncle all completed seizure reports describing the Plaintiff's seizures that were essentially a result of uncontrolled diabetes. (ECF No. 15-7, pp. 21-28). The objective evidence is consistent with the Plaintiff's complaints, as his diabetes was regularly

---

[8] Humulin is used to treat type I diabetes. *See* Human Insulin Injection, at https://medlineplus.gov/druginfo/meds/a682611.html (last accessed July 23, 2021). Propranolol is used to treat high blood pressure. *See* Propranolol, at https://medlineplus.gov/druginfo/meds/a682607.html (last accessed July 26, 2021). Risperidone is used to treat schizophrenia. *See* Risperidone, at https://medlineplus.gov/druginfo/meds/a694015.html (last accessed July 26, 2021. Hydroxyzine pamoate is used to treat allergic skin reactions and anxiety and tension. *See* Hydroxyzine, at https://medlineplus.gov/druginfo/meds/a682866.html (last accessed July 26, 2021).

described as uncontrolled, he was regularly reminded to follow a diabetic diet, and he required emergency care to stabilize his blood sugar on multiple occasions.

As to the opinion evidence regarding the Plaintiff's ability to function in the workplace, in August and October 2016, DDS physicians found that the Plaintiff would be moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in work settings, and set realistic goals or make plans independently of others. (ECF No. 15-4, pp. 23-25).

In support of prior disability applications, Dr. Shry evaluated the Plaintiff in 2006 and 2012 (ECF No. 15-8, pp. 3-5, 8-16), and the ALJ considered these opinions in his decision (ECF No. 15-2, p. 23). In 2006, Dr. Shry observed significant levels of anxiety that could impair the Plaintiff's ability to be a reliable employee. (ECF No. 15-8, pp. 3-5). He opined that the Plaintiff was in need of psychiatric intervention to deal with generalized anxiety. In 2012, Dr. Shry observed a motivational issue related to traits associated with Personality Disorder, NOS with strong anti-social traits. (*Id.* at 8-16). Dr. Shry believed that the Plaintiff would be moderately to severely impaired in his ability to communicate and interact in a socially adequate manner when under stress. (*Id.*). He believed that the Plaintiff would be significantly impaired in his ability to sustain persistence when completing tasks due to traits associated with Other Specified Personality Disorder. (*Id.*).

In May 2016, Dr. Shry conducted a mental consultative exam of Plaintiff. (ECF No. 15-8, pp. 78-83). He reiterated the same opinion he offered regarding the effects of the Plaintiff's mental impairments on his adaptive functioning in 2012 – moderately to severely impaired in communication and social interaction when stressed and significantly impaired in ability to sustain persistence due to Other Specified Personality Disorder. (*Id.*).

While the ALJ gave these opinions some weight, he noted that the Plaintiff lived with and got along with his mother; spent time at home with his nephew, daughter, and significant other; regularly had friends over; attended college courses; and could occasionally go into shops and attend church. (ECF No. 15-2, pp. 15-23). The ALJ contrasted the Plaintiff's reports and behaviors demonstrating inability to spend time in public around strangers with his apparent ability to spend time at home with friends and family. The ALJ pointed to inconsistency between the Plaintiff's statements that he suffered from social anxiety when around many people in public and the fact that he often had friends visiting him at his mother's home.

However, individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). The Plaintiff stated that while he could attend a weekly evening church service, he required accompaniment and he could only sit in the back. (ECF No. 15-7, pp. 6-20). While he rarely went shopping, he would do so as quickly as possible and only in the smallest, least crowded stores. (*Id.*). While the Plaintiff had been enrolled in college courses on several occasions, he exclusively attended online only and never finished a bachelor's degree. (ECF No. 15-3, pp. 9-10). The Plaintiff lived with and was supported by his mother throughout the relevant period and had no driver's license that would allow him to go out independently. (*Id.*).

Further, counselling records reveal that the Plaintiff requested appointments in the afternoons when fewer people were there because he was extremely nervous around people. (ECF No. 15-9, p. 99). As the Plaintiff's complaints of anxiety and depressive symptoms increased, he began failing to attend therapy sessions or complete online coursework. (ECF No. 15-9, pp. 94-112). The Plaintiff avers in his brief that he left the emergency department against medical advice due to severe social anxiety around people. (ECF No. 18, p. 3).

Thus, the record demonstrates that Plaintiff's social anxiety hinders his ability to remain in public areas while under stress, or to consistently attend counseling sessions despite his need for mental and physical treatment. There is a clear distinction between social interactions in public among strangers and social interactions with friends and family in one's own home. The Plaintiff is also clearly impaired in his ability follow medical advice to properly manage his diabetes.

As the ALJ did not indicate that he considered or addressed pertinent reasons why the Plaintiff might have not pursued more consistent treatment, or explained how he considered the Plaintiff's reasons for not pursuing advised treatment when he evaluated the Plaintiff's symptoms, we find that the RFC assessed by the ALJ is not supported by substantial evidence.

Accordingly, substantial evidence does not support the ALJ's decision in this case, and the case must be reversed and remanded to allow the ALJ to reconsider the evidence concerning the Plaintiff's RFC.

## V. Conclusion

Based on the foregoing analysis, it is recommended that this case be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of July 2021.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE